## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| LAWRENCE HOLLIN, Derivatively on Behalf of Nominal Defendant SAREPTA THERAPEUTICS, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:25-cv-05793 |
| v. | ) ) | JURY TRIAL DEMANDED |
| M. KATHLEEN BEHRENS, RICHARD J. BARRY, KATHRYN BOOR, MICHAEL CHAMBERS, DEIRDRE CONNELLY, DOUGLAS S. INGRAM, STEPHEN L. MAYO, CLAUDE NICAISE, HANS WIGZELL, DALLAN MURRAY, and LOUISE RODINO-KLAPAC, | ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| SAREPTA THERAPEUTICS, INC., | ) ) | |
| Nominal Defendant. | ) | |

## <u>VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Lawrence Hollin ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Sarepta Therapeutics, Inc. ("Sarepta" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Company's publicly available documents, conference call transcripts and public announcements, United States Securities and Exchange

Commission ("SEC") filings, press releases published by and regarding Sarepta, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of Sarepta against certain officers and members of the Company's Board for breaches of their fiduciary duties and other violations between June 22, 2023 and June 24, 2025, inclusive (the "Relevant Period"), as set forth below.

2.      According to its public filings, Sarepta engineers precision genetic medicine for rare diseases. The Company claims to hold leadership positions in Duchenne muscular dystrophy ("Duchenne") and limb-girdle muscular dystrophies ("LGMDs") and is building a robust portfolio of programs across muscle, central nervous system, and cardiac diseases.

3.      Sarepta has been engaged in the development of therapies to treat Duchenne, including ELEVIDYS (delandistrogene moxeparvovec-rokl). ELEVIDYS is a prescription gene therapy intended for certain individuals with Duchenne.

4.      As alleged herein, Defendants made materially false and misleading statements that led investors to believe that ELEVIDYS was safe and could be expanded for approval of wider applications. Defendants also misled investors regarding ELEVIDYS's revenue outlook.

5.      Then on March 18, 2025, Sarepta announced that a patient died after being treated with ELEVIDYS.

6.      Following this news, the Company's stock price fell 27.44 percent, or $27.81 per share, to close at $73.54 per share on March 18, 2025.

7.      On April 4, 2025, the Company revealed that European Union authorities requested that an independent data monitoring committee meet to review the patient death that was announced on March 18, 2025. The Company also halted recruitment and dosing in certain ELEVIDYS clinical studies.

8.      Following this news, the Company's stock price fell 7.13 percent, or $4.18 per share, to close at $54.43 per share on April 4, 2025.

9.      On June 15, 2025, the Company revealed that a second patient died following ELEVIDYS treatment. Sarepta reported that it was suspending shipments of ELEVIDYS for non-ambulatory patients while the Company evaluated trial regimens and discussed findings with regulatory authorities. The Company further disclosed that it was halting dosing in one of its ELEVIDYS clinical studies.

10.     Following this news, the Company's stock price fell 42.12 percent, or $15.24 per share, to close at $20.91 per share on June 15, 2025.

11.     Then on June 24, 2025, the United States Food and Drug Administration (the "FDA") announced that it received reports of two deaths and was investigating risks following treatment with ELEVIDYS. The FDA noted that it was evaluating whether further regulatory action was necessary.

12.     Following this news, the Company's stock price fell 8.01 percent, or $1.52 per to close at $17.46 per share on June 25, 2025.

13.     As a result of the foregoing, a securities fraud class action was filed against the Company, captioned *Dolgicer v. Sarepta Therapeutics, Inc.*, Case No. 1:25-cv-05317 (S.D.N.Y.) (the "Securities Class Action").

14.    The Securities Class Action has caused, and will continue to cause, Sarepta to expend significant funds to defend itself against the claims asserted in that action, and exposed the Company to massive potential class-wide liability.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9) promulgated thereunder by the SEC, Section 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder, and Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)).

16.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.    This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

18.    In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

19.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, Defendants' actions have had an effect in this District, and the Securities Class Action is pending in this District.

## PARTIES

*Plaintiff*

20.    Plaintiff is, and has been at all relevant times, a shareholder of Sarepta.

*Nominal Defendant*

21.     Nominal Defendant Sarepta is a Delaware corporation with its principal executive offices located at 215 First Street, Cambridge, Massachusetts 02142.  Sarepta's common stock trades on the NASDAQ under the ticker symbol "SRPT."

*Individual Defendants*

22.     Defendant M. Kathleen Behrens ("Behrens") has served as a member of the Board since March 2009 and as Chairwoman of the Board since April 2015. She also serves as a member of the Research and Development Committee and as a member of and Chair of the Audit Committee.

23.     Defendant Richard J. Barry ("Barry") has served as a member of the Board since June 2015. He also serves as a member of the Audit Committee and Chair of the Nominating and Corporate Governance Committee and Compensation Committee.

24.     Defendant Kathryn Boor ("Boor") has served as a member of the Board since June 2022. She also serves as member of the Nominating and Corporate Governance Committee and a member of the Compensation Committee.

25.     Defendant Michael Chambers ("Chambers") has served as a member of the Board since June 2022. He also serves as a member of the Research and Development Committee.

26.     Defendant Deirdre Connelly ("Connelly") has served as a member of the Board since September 2024. She also serves as a member of the Nominating and Corporate Governance Committee and a member of the Compensation Committee.

27.     Defendant Douglas S. Ingram ("Ingram") has served as President, Chief Executive Officer ("CEO"), and a Board member since 2017. Ingram has been named as a defendant in the Securities Class Action.

28.     Defendant Stephen Mayo ("Mayo") has served as a member of the Board since November 2021. He also serves as a member of the Research and Development Committee and the Audit Committee.

29.     Defendant Claude Nicaise ("Nicaise") has served as a member of the Board since June 2015. He also serves as a member of the Compensation Committee and as a member of the Research and Development Committee.

30.     Defendant Hans Wigzell ("Wigzell") has served as a member of the Board since June 2010. He also serves as a member of the Nominating and Corporate Governance Committee and a member of and Chair of the Research and Development Committee.

31.     Defendant Dallan Murray ("Murray") joined Sarepta in 2013 as Vice President, Marketing, and serves as Executive Vice President and Chief Customer Officer. Murray has been named as a defendant in the Securities Class Action.

32.     Defendant Louise R. Rodino-Klapac ("Rodino-Klapac") joined Sarepta in June 2018 and was appointed Executive Vice President and Chief Scientific Officer in December 2020. Prior to this role, she served as Sarepta's Senior Vice President, Gene Therapy. She became Head of R&D in November 2021. Rodino-Klapac has been named as a defendant in the Securities Class Action.

33.     Defendants referenced in paragraphs 22 through 32 are herein referred to as the "Individual Defendants."

**INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES**

34.     By reason of their positions as officers and/or directors of Sarepta, and because of their ability to control the business and corporate affairs of Sarepta, the Individual Defendants owed Sarepta and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Sarepta in a fair, just,

6

honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Sarepta and its shareholders.

35.     Each director and officer of the Company owes to Sarepta and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

36.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Sarepta, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

37.     To discharge their duties, the officers and directors of Sarepta were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

38.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Sarepta, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

39.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of

inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

40. To discharge their duties, the officers and directors of Sarepta were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Sarepta were required to, among other things:

(i) Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Sarepta' own Code of Business Conduct and Ethics ("Code of Conduct");

(ii) Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii) Remain informed as to how Sarepta conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv) Establish and maintain systematic and accurate records and reports of the business and internal affairs of Sarepta and procedures for the reporting of the business and internal

affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(v)     Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Sarepta' operations would comply with all applicable laws and Sarepta' financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vi)     Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii)     Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(viii)    Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

41.     Each of the Individual Defendants further owed to Sarepta and the shareholders the duty of loyalty requiring that each favor Sarepta' interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

42.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Sarepta and were at all times acting within the course and scope of such agency.

43.     Because of their advisory, executive, managerial, and directorial positions with Sarepta, each of the Individual Defendants had access to adverse, non-public information about the Company.

44.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Sarepta.

## SAREPTA'S CODE OF CONDUCT

45.     Sarepta's Code of Conduct, which was last updated on December 8, 2023, provides:

Sarepta Therapeutics, Inc. (the "Company") is committed to maintaining the highest standards of business conduct and ethics. This Code of Business Conduct and Ethics (the "Code") reflects the business practices and principles of behavior that support this commitment. We expect every employee, officer and director to read and understand this Code and its application to the performance of his or her responsibilities with the Company. References in this Code to employees are intended to cover officers and, as applicable, directors.

Officers, managers and other supervisors are expected to develop in employees a sense of commitment to the spirit, as well as the letter, of this Code. Supervisors are also expected to direct all agents and contractors to conform to Code standards when working for or on behalf of the Company. The compliance environment within each supervisor's assigned area of responsibility will be a significant factor in evaluating the quality of that individual's performance. In addition, any employee who makes an exemplary effort to implement and uphold our legal and ethical standards, as embodied by this Code, may be recognized for that effort in his or her performance review. Please note, however, that nothing in this Code alters the at-will employment policy of the Company.

This Code addresses conduct that is particularly important to proper dealings with the people and entities with whom we as a company interact. However, it reflects only a part of our overall commitment to proper business conduct and ethics. From time to time, we may adopt additional policies and procedures with which our employees, officers and directors are expected to comply, if applicable to them. However, it is the responsibility of each employee to apply common sense, together with his or her own highest personal ethical standards, in making business decisions in the absence of a stated guideline in this Code.

46.     The Code of Conduct further states:

1. Honest and Ethical Conduct

The Company's policy is to promote high standards of integrity by conducting our affairs in an honest and ethical manner. The integrity and reputation of the Company depends on the honesty, fairness and integrity brought to the job by each person associated with us. Unyielding personal integrity is the foundation of corporate integrity.

2. Legal Compliance

Obeying the law, both in letter and in spirit, is the foundation of this Code. Our success depends upon each employee operating within legal guidelines and cooperating with local, national and international authorities. No employee has authority to violate any law or to direct another employee or any other person to violate the law on behalf of the Company. We hold periodic training sessions to educate employees on the relevant laws, rules and regulations associated with their employment, including laws prohibiting insider trading (which are discussed in further detail in Section 3 below). While we do not expect you to memorize every detail of these laws, rules and regulations, we want you to be able to determine when to seek advice from others. If you do have a question in the area of legal compliance, it is important that you not hesitate to seek answers from your supervisor or the Chief Compliance Officer (as provided in Section 16).

Violation of domestic or foreign laws, rules and regulations may subject an individual, as well as the Company, to civil and/or criminal penalties. You should be aware that conduct and records, including e-mails, are subject to internal and external audits, and to discovery by third parties in the event of a government investigation or civil litigation. It is in everyone's best interests to know and comply with our legal obligations.

3. Insider Trading

Sarepta requires compliance with all applicable securities laws, including those with respect to insider trading. The Company's Insider Trading Policy provides the Company's guidelines with respect to trading, and causing the trading of, the Company's securities or securities of certain other publicly-traded companies and the handling of confidential information. The Insider Trading Policy applies to all Sarepta directors, officers and employees.

47.    The Code of Conduct continues:

9. Maintenance of Corporate Books, Records, Documents and Accounts; Financial Integrity; Public Reporting

The integrity of our records and public disclosure depends upon the validity, accuracy and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. Intentionally making false or misleading entries, whether they relate to financial results or test results, is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, creditors, employees, stockholders and others with whom we do business. As a result, it is important that our books, records and accounts accurately and fairly reflect, in reasonable detail, our assets, liabilities, revenues,

costs and expenses, as well as all transactions and changes in assets and liabilities. We require that:

• no entry be made in our books and records that intentionally hides or disguises the nature of any transaction or of any of our liabilities, or misclassifies any transactions as to accounts or accounting periods;

• transactions be supported by appropriate documentation;

• the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in our books and records;

• employees understand and seek to comply with our system of internal controls; and

• no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund.

Our accounting records are also relied upon to produce reports for our management, stockholders and creditors, as well as for governmental agencies. In particular, we rely upon our accounting and other business and corporate records in preparing the periodic and current reports that we file with the Securities and Exchange Commission (the "SEC"). Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is accurate and transparent and that our reports contain all of the information about the Company that would be important to enable stockholders and potential investors to assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures. In addition:

• no employee may take or authorize any action that would intentionally cause our financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

• all employees must cooperate fully with our Accounting Department, as well as our independent public accountants and counsel, respond to their questions with candor and provide them with complete and accurate information; and

• no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of our reports accurate in all material

respects.

Any employee who becomes aware of any departure from these standards has a responsibility to report his or her knowledge promptly to the Chief Compliance Officer, or one of the other compliance resources described in Section 16.

48.    Moreover, the Code of Conduct provides:

16. Compliance Standards and Procedures

Compliance Resources

Our Chief Compliance Officer oversees this Code as well as any of our training programs related to compliance with this Code. The Chief Compliance Officer is a person to whom you can address any questions or concerns. The Chief Compliance Officer, Katrina Cahill, may be reached at (617) 301-8655 or kcahill@sarepta.com. In addition to fielding questions or concerns with respect to potential violations of this Code, the Chief Compliance Officer is responsible for:

• investigating possible violations of this Code;

• training new employees in Code policies;

• conducting annual training sessions to refresh employees' familiarity with this Code;

• distributing copies of this Code annually via e-mail to each employee with a reminder that each employee is responsible for reading, understanding and complying with this Code;

• updating this Code as needed and alerting employees to any updates, with approval when appropriate, of the Nominating and Corporate Governance Committee of the Board of Directors, to reflect changes in the law, Company operations and in recognized best practices, and to reflect Company experience; and

• otherwise promoting an atmosphere of responsible and ethical conduct.

## SAREPTA'S AUDIT COMMITTEE CHARTER

49.    Sarepta's Audit Committee is governed by its Audit Committee Charter, which was

last amended on April 6, 2023.

50.    As set forth in the Audit Committee Charter:

The Audit Committee shall assist the Board in the exercise of its fiduciary responsibility of providing oversight of (a) the integrity of the Company's financial statements and the financial reporting processes, internal accounting and financial controls, (b) the Company's compliance with legal and regulatory requirements, (c) the independent auditor's qualifications and independence and (d) the performance of the Company's independent auditor.

51.     The Audit Committee Charter further provides, in a section titled "Responsibilities and Duties":

The Company's management is responsible for preparing the Company's financial statements and the independent auditors are responsible for auditing those financial statements. The Committee is responsible for overseeing the conduct of these activities by the Company's management and the independent auditors. In carrying out its oversight responsibilities, the Committee is not providing any expert or special assurance as to the Company's financial statements or any professional certification as to the independent auditors' work.

The specific duties of the Committee include the following: . . .

9. Meet with management and the independent auditors prior to commencement of the annual audits and internal controls analysis and testing to review and discuss the planned scope and objectives of the audit and/or such analysis and testing, and review the scope and plan of internal audit procedures to be performed by financial consultants;

10. Meet with the independent auditors, with and without management present, after completion of the annual audit to review and discuss the results of the examinations of the independent auditors and appropriate analyses of the financial statements;

11. Prior to the filing of any Annual Report on Form 10-K, review and discuss with management, internal audit staff and the independent auditor (a) reports as to the state of the Company's financial reporting systems and procedures, the adequacy of and testing results of internal accounting and financial controls, the integrity and competency of the financial and accounting staff, disclosure controls and procedures, other aspects of the financial management of the Company, (b) recommendations for both the improvement of existing controls and adoption of new controls, including any special steps or remedial measures adopted in light of material control weaknesses or significant deficiencies, if any, (c) current accounting trends and developments, and take such action with respect thereto as may be deemed appropriate;

12. Review the interim financial statements with management and the independent auditors prior to the filing of the Company's Quarterly Reports on Form 10-Q and

discuss the results of the quarterly reviews and any other matters required to be communicated to the Committee by the independent auditors under generally accepted auditing standards;

13. Review and discuss with management and the independent auditors the financial statements to be included in the Company's Annual Report on Form 10-K (or the annual report to stockholders if distributed prior to the filing of Form 10-K), including the judgment of the independent auditors about the quality, not just acceptability, of accounting principles, the reasonableness of significant judgments, and the clarity of the disclosures in the financial statements;

14. Recommend to the Board, based upon the Committee's review, whether the financial statements should be included in the annual report on Form 10-K;

15. Prepare a report of the Committee each year for inclusion in the Company's proxy statement in accordance with SEC rules;

16. Review press releases, as well as Company policies with respect to earnings press releases, and financial information provided to analysts and review such releases, and information and oversee the use of non-Generally Accepted Accounting Principles (non-GAAP) financial measures and related disclosures, including compliance with the Company's Non-GAAP Financial Measures Accounting Policy;

Risk Assessment and Risk Management

17. Periodically, but no less than annually, discuss Company policies with respect to risk assessment and risk management, and review risks that may be material to the Company's financial operations and major legislative and regulatory developments that could materially impact the Company's financial operations and risks;

Compliance Oversight and Reporting

18. Review (a) the status of compliance with laws, regulations, and internal procedures, including, without limitation, the Company's policies on ethical business practices; and (b) the scope and status of systems designed to promote Company compliance with laws, regulations and internal procedures, through receiving reports from management, legal counsel and third parties as determined by the Committee and report on the same to the Board;

19. Establish procedures for the confidential and anonymous receipt, retention and treatment of complaints regarding the Company's accounting, internal controls, auditing matters and compliance with the Company's ethical business policies;

20. Ensure that the Company maintains a written Code of Business Conduct and Ethics and other policies and procedures that effectively address the Company's compliance obligations, avoidance of conflicts of interest, and other related matters.

Other Responsibilities

21. Review and approve all related-party transactions between the Company and executive officers, directors and associates and affiliates thereof, in accordance with the rules and regulations of the SEC;

22. Oversee the integrity of the Company's information technology systems, processes and data and, at its discretion, periodically (but no less than annually), review and assess with management and the Company' s internal audit personnel (or other personnel responsible for the internal audit function), the adequacy and effectiveness of security for the Company's information technology systems, processes and data and the Company's contingency plans in the event of a breakdown or security breach affecting the Company's information technology systems, and data or the information technology systems, processes and data of the Company's partners;

23. Review and assess the adequacy of this Charter annually with the Board as a whole and report to the Board any significant matters as they occur during the year; and

24. Conduct such other duties and undertake such other tasks as may be appropriate to the overall purposes for the Committee and as may be assigned from time to time by the Board consistent with such purposes.

## SUBSTANTIVE ALLEGATIONS

**Background**

52.     According to its public filings, Sarepta engineers precision genetic medicine for rare diseases. The Company claims to hold leadership positions in Duchenne and LGMDs and is building a robust portfolio of programs across muscle, central nervous system, and cardiac diseases.

53.     In June 2023, the FDA granted accelerated approval for ELEVIDYS. This allowed ELEVIDYS to be used for certain ambulatory patients. The FDA's accelerated program allows for an expedited approval process for products that treat serious conditions and fill an unmet medical need. Therapies may be approved based on a company's reported surrogate endpoints, even before

16

their intended benefits are fully verified.

54.    The Company began working with patients and healthcare providers to prescribe ELEVIDYS. Sarepta also conducted clinical trials for ELEVIDYS to show its purported efficacy and to expand its application to a wider range of individuals with Duchenne. As such, Defendants projected that wider use of ELEVIDYS would occur and accelerate revenues.

**Materially False and Misleading Statements**

55.    On June 22, 2023, the Company issued a press release reporting the start of an ELEVIDYS clinical trial. In the press release, Individual Defendant Ingram stated:

> As we prepare to launch ELEVIDYS, we should acknowledge and celebrate the decades of dedication and work from the patient community, families, clinicians, and our Sarepta colleagues that resulted in today's approval. Our confirmatory trial, EMBARK, should read out in the fourth quarter of this year. *If EMBARK confirms the benefits seen in our prior trials*,[1] Sarepta will move rapidly to submit a BLA supplement to expand the approved label as broadly as good science permits.

56.    On August 2, 2023, the Company issued a press release reporting Sarepta's financial results for the 2023 second quarter. In the press release, Ingram stated: "The launch of ELEVIDYS is off to a great start, with our first reimbursed infusion today, ahead of plan. In addition to making this launch a success, our paramount goal is to translate a positive result in our confirmatory trial, EMBARK, later this year to a broad label as rapidly as possible."

57.    Also on August 2, 2023, Defendants hosted a conference call to discuss the Company's financial results, during which Ingram commented: "ELEVIDYS is our fourth approved Duchenne therapy, *and we have been very successful with all of our prior launches, consistent with our track record, the ELEVIDYS launch is going well*."

---

[1] Unless otherwise indicated, all emphasis is added.

58.    Further, Individual Defendant Rodino-Klapac stated: "As we look forward to the weeks and months ahead, we remain firmly committed to our values to **follow the science and present objective evidence that supports an ELEVIDYS's ability to change the trajectory of Duchenne muscular dystrophy**." Rodino-Klapac further stated:

> **In clinical trials, ELEVIDYS demonstrated positive results at multiple time points, including one two and four years after treatment in addition to consistent safety profile**. The BLA for ELEVIDYS included efficacy and safety data from studies 101, 102, and 103 for ENDEAVOR, as well as an integrated analysis across these three clinical studies, comparing functional results to propensity score matched external control. . . .

> The data from studies 101, 102 and 103 Cohort 1, which is ages four to seven have now been either published or accepted for publication in peer-reviewed journals. **When compared to appropriate control populations, ELEVIDYS has consistently shown a treatment effect as measured by change in MSA score at one year**.

59.    Moreover, Individual Defendant Murray stated:

> And finally to touch on antibody testing, over 700 kits are in the hands of our key sites within a day or two of approval. Testing is currently underway, and the process is working smoothly. **We've seen very strong demand for ELEVIDYS and are encouraged by the discussions with KOLs, payers and the broader community**.

> We began receiving enrollment forms within hours of approval, and we continue to see them come in on a daily basis. . . .

> Launching the first gene therapy for Duchenne patients requires a multifaceted approach with a high level of communication not only with HCPs and sites, but also patients, families and payers to ensure patients have timely access to this groundbreaking therapy. **As a result of our preparation and diligent efforts, we are now at the point where patients can begin receiving ELEVIDYS with confidence**.

60.    On November 1, 2023, the Company issued a press release reporting Sarepta's 2023 third quarter financial results. The Company reported that the EMBARK trial's topline results "support the conclusion that ELEVIDYS modifies the course of the disease in patients with Duchenne," and "no new safety signals were observed." In the press release, Ingram stated:

18

The third quarter was a defining moment for Sarepta. We launched ELEVIDYS, our fourth therapy and the first gene therapy for boys with Duchenne muscular dystrophy, we continued to drive great performance of our three PMOs and importantly, on a non-GAAP basis we have achieved profitability, placing us in ever more rarified territory in biotech. . . .

Reflecting a superb launch, ELEVIDYS net product revenue came in at $69.1 million. Total net product revenue stands at $309.3 million, growing 49 percent over the same quarter last year. And non-GAAP earnings stood at approximately $38.0 million in the quarter, a major milestone for Sarepta.

61.    Also on November 1, 2023, Defendants hosted a conference call to discuss the

Company's financial results, during which Ingram stated:

First, taken as a whole, ***the results of EMBARK confirm that ELEVIDYS stabilizes muscles, slows or entirely arrests decline, does so across the ages, and does so with a laudable safety profile not shared by other programs for Duchenne***.

Second, the EMBARK results have not only satisfied the confirmatory requirements for our June approval, but ***have shown that ELEVIDYS benefits patients across age groups consistent with its mechanism of action***. Hence, we will soon be submitting a BLA supplement to broaden the ELEVIDYS label to remove age and ambulation restrictions. . . .

Third quarter total revenue came in at $332 million, and total net product revenue stands at $309.32 million, growing 49% over the same quarter last year reflecting the team's ability to execute and serve Duchenne patients. ***ELEVIDYS net product revenue came in at $69.11 million, nearly tripled mean external consensus***.

62.    Moreover, Murray commented:

[W]e generated just over $69 million in net product revenues in the third quarter for ELEVIDYS. ***Notably, the team exceeded our own lofty site readiness expectations with nearly 70 sites ready to dose today. This helps us support the patients at risk of aging out today and also sets us up for longer term success going forward***. . . .

The team is working diligently as we speak, educating the payers on the robustness of the newly available EMBARK data. ***We're confident that this data sets the stage nicely for access to align with our label today, as well as when we gain a broader label***. . . .

So to summarize ELEVIDYS, it was a great first quarter for the launch because our team and our key stakeholders were prepared and they executed flawlessly to

support the patients we serve. ***Driven in large part by the robust ELEVIDYS revenue in the third quarter, we grew overall net product revenue by roughly 30% over the prior quarter.*** Net product revenue in Q3 of 2023 was $309.3 million.

63.     In response to a question from a Bank of America Merrill Lynch analyst regarding when Sarepta would complete its Biologics License Application ("BLA") filing with the FDA, Ingram stated:

> [T]he inquiry … is focused, and that focus is on the fundamental question, does the totality of the evidence, justify conclusion that ***ELEVIDYS is bringing a better life to these patients. And of course, we believe that it does. The standard for this is quite clear***. . . .
>
> The statute says it's very clear. ***Can one fairly and responsibly conclude that the therapy will have the effect it purports to have***, and the regulations are also particularly clear that for life-threatening and severely debilitating illnesses one's life can be shed especially where no satisfactory alternative therapy exists.

64.     On February 28, 2024, the Company issued a press release announcing Sarepta's 2023 fourth quarter and full year financial results. Sarepta reported that the FDA accepted its efficacy BLA supplement for ELEVIDYS, which could allow the Company to expand therapy applications. Sarepta stated that it planned to widen the labeled indication for ELEVIDYS and convert the accelerated FDA approval for ELEVIDYS to a traditional FDA approval.

65.     Also on February 28, 2024, Defendants hosted a conference call to discuss the Company's financial results, during which Ingram stated:

> In addition to continuing strong performance among our three approved therapies, ***ELEVIDYS' performance was particularly impressive, and reflects first-in-class launch excellence, notwithstanding, a label limited to four and five-year-olds, representing only about 3% or so of the total Duchenne population. ELEVIDYS net product revenue was $131.2 million for the quarter, and over $200 million for the full-year.*** I'm exceptionally proud of the team's performance here, which speaks to our level of preparation and attention to detail, expert understanding of all aspects of launching innovative rare disease therapies, and, of course, our passion for bringing a better life to those living with Duchenne.

66.     Moreover, Murray commented:

Turning to ELEVIDYS, we're extremely pleased with launch execution, exceeding our own lofty expectations. In fact, the $200 million in net product revenue surpassed the combined 2023 revenue of the other five gene therapy launches from the past 18 months. Remarkable, given the ELEVIDYS approval occurred just this past summer. ***The success of ELEVIDYS shows that gene therapy can be commercially viable***, providing hope for those patients with Duchenne, and for all those with genetic conditions with unmet need. While revenue is how we quantify the success of this launch externally, we measure ourselves on how we support patients.

67.    Further, Rodino-Klapac stated:

In June 2023, the FDA granted accelerated approval to ELEVIDYS, [the] first gene therapy to treat Duchenne muscular dystrophy. ***Since that time, we've been successfully treating ambulatory pediatric patients aged four through five years with Duchenne, who have a confirmed mutation in the DMD gene***. And then, just about two weeks ago, and as Doug mentioned, we were thrilled to announce that the FDA accepted and filed our efficacy supplement for ELEVIDYS, whereby they will now evaluate broadening the approved indication of ELEVIDYS. By removing age and emulation restrictions and converting the ELEVIDYS accelerated approval to a traditional approval.

68.    On May 1, 2024, the Company issued a press release reporting Sarepta's 2024 first quarter financial results. The Company stated that ELEVIDYS generated net revenues of $133.9 million for the first quarter. Ingram commented:

[O]ur recently approved gene therapy, ELEVIDYS, achieved nearly $134.0 million in net product revenue in the quarter. Although its initial label is quite narrow, ***ELEVIDYS has posted cumulative sales of over $334.0 million since its approval in June of last year, far exceeding performance of all other gene therapies approved in the last few years combined***. Working with the FDA, we continue to productively prosecute our BLA supplement to expand the ELEVIDYS addressable population, with a target action date of June 21, 2024. If successful, 2024 could be the most profound year yet in our fight against the effects of Duchenne muscular dystrophy and a bellwether for the transformative potential of gene therapy for rare disease.

69.    Also on May 1, 2024, Defendants hosted a conference call to discuss the Company's financial results, during which Ingram stated:

***[W]e have already posted over $334 million since our [ELEVIDYS] approval last June, far exceeding all other gene therapies approved in the last few years combined. This says much about the opportunity in front of us.*** Physician and

patient demand are significant. We are working well with public and private payers to facilitate access and our multiyear obsessive preparation in sight readiness, manufacturing, distribution, access and support is all paying off.

70.    Further, Rodino-Klapac stated:

As Doug mentioned in his opening remarks, the BLA supplements for ELEVIDYS was submitted in December of last year. We requested the removal of any age or ambulation restrictions in the label and conversion to traditional approval. ***The totality of data generated for ELEVIDYS supports but is a disease-modifying therapy that changes the trajectory of Duchenne, demonstrating a treatment benefit that is clinically meaningful and similar regardless of age.***

71.    On June 20, 2024, the Company issued a press release reporting FDA approval of ELEVIDYS for patients ages four and above, irrespective of ambulatory status. Defendant Ingram stated that the approval was "a watershed occasion for the promise of gene therapy and a win for science."

72.    On August 7, 2024, the Company issued a press release reporting Sarepta's 2024 second quarter financial results. The press release once again reported the FDA's approval for ELEVIDYS for all patients at least four years of age. Ingram commented: "***We look forward to reviewing the comprehensive data supporting the safety and efficacy of ELEVIDYS*** at the 29th Annual Congress of the World Muscle Society taking place in October, including muscle and cardiac MRI data and other biomarker results showing improvement in muscle health of treated patients."

73.    Also on August 7, 2024, Defendants hosted a conference call to discuss the Company's financial results, during which Ingram commented:

Anyone who has been watching over the last seven-plus years will realize that this is exactly what we are particularly good at. Certainly, we are great at developing therapies for rare disease, and we are great at managing the process to get them approved and we have become exceptional at managing complex manufacturing and distribution. But perhaps above all else, we are second to no one in the world at launching Duchenne therapies, working with payers and ensuring access.

As we have noted previously, with the broader label granted in June of this year, the opportunity to serve patients and in so doing reward committed investors will be enormous. ***Our early launch has exceeded even our optimistic expectations. All signals are currently positive from physician and patient demand to enrollment forms to assay kit ordering to positive payer interactions***.

74.    Moreover, Murray stated:

Now turning to the ELEVIDYS launch. We're pleased with the launch progress date and are on track to realize the opportunity in front of us. To put the current situation into perspective, almost the entire Duchenne population became eligible for ELEVIDYS essentially overnight. What we're seeing right now is the key neuromuscular centers reacting to unprecedented demand from entirety of their Duchenne patient populations. The treating sites are rapidly working through and prioritizing patient demand. We're confident in their ability to manage this, given the fact that these are the same centers who navigated all of the recent Duchenne and SMA launches, including Zolgensma.

Your uptake assumptions should reflect the patient journey to obtain an infused gene therapy. We're only several weeks into this new launch. However, ***we have some exciting successes to report, which highlight the progress the team has made in the short time we've had with the ELEVIDYS label expansion***.

75.    Further, Rodino-Klapac commented: "The mechanism of action of ELEVIDYS is universal, regardless of disease state as long as muscle is present. As a result, ***the ELEVIDYS dystrophin expressed by our therapy in non-ambulatory patients is reasonably likely to clinical benefit in this population***. As a result, accelerated approval or AA has been granted for the treatment of non-ambulatory patients, ages 4 and older."

76.    In response to a Bank of America Merrill Lynch analyst, who asked what changed with the enrollment to therapy process "from the time that you got approved for the four- to five-year roles, when did it start lengthening to what you're saying, what is it three to six months that it's going to take?," Ingram stated:

Thank you very much for your question. The short answer is, there really is no bottleneck at all. Now, as I think we said in the last earnings call, it's clearly the case that with the four- to five-year-olds, we were all in. I mean all, not just us, physicians, families and the payers, we're all in kind of a crisis mode, prioritizing kids that were about to age out of the label, and we're able to do it more rapidly

than is normal.

But the normal process is about three to five months. And I mean normal that's not atypical for these sorts of therapies, but it's very typical for EXONDYS, VYONDYS, AMONDYS, and now ELEVIDYS. ELEVIDYS has some additional requirements, including, for instance, the requirement that one test for and is negative for neutralizing antibodies. So, to be very clear, there is no bottleneck here. *We're doing brilliantly. That start forms are great. Patient and physician demand is great. Manufacturing is great. Everything is going very, very well*. . . .

And then it's going to take three to five months. That means that we're going to have nice growth in Q3, but it will be moderated and then Q4 will be very strong growth, as we've mentioned, more than double the growth in Q4 of this year. And then *as we model right now, based on everything we're seeing, we're going to do between $2.9 billion and $3.1 billion in revenue across the four therapies next year, which speaks to the success that we believe is happening with ELEVIDYS*, and it speaks to the continuing success of our PMOs and the fact that we're seeing fairly modest cannibalization, and we imagine we'll see fairly modest cannibalization in the next year.

77.    On November 6, 2024, the Company issued a press release reporting Sarepta's 2024 third quarter financial results. Ingram stated: "*Reflecting our detailed preparation and track record of commercial execution, the launch of ELEVIDYS is proceeding to plan*. ELEVIDYS net product revenue was $181.0 million in the quarter, exceeding prior guidance."

78.    Also on November 6, 2024, Defendants hosted a conference call to discuss the Company's financial results, during which Ingram stated: "We are tracking well to Q4 and 2025 performance consistent with prior guidance. . . . Additionally, our program to move ELEVIDYS to suspension manufacturing is proceeding very well. We have had very encouraging interactions with the FDA, and we continue our engineering runs in anticipation of commencing a bridging study in 2025."

79.    Further, Rodino-Klapac commented:

We continue to advance the ELEVIDYS clinical program and share new datasets as they become available. We recently published the primary one year EMBARK results in Nature Medicine, a high impact journal. In addition, we had multiple presentations at the World Muscle Society Congress in early October. This included

additional EMBARK data, Muscle MRI and Cardiac MRI. ***Muscle MRI changes were consistent with functional outcomes from EMBARK Part 1, showing stabilization or slowing of disease progression with SRP-9001, while progression occurred in placebo treated patients evidenced by accumulation of fat and fibrosis***.

***In addition to the EMBARK data, we've also presented safety and expression data from Study 103 or ENDEAVOR, demonstrating consistent safety and expression data across ambulatory and non-ambulatory patients. As of the end of October 2024, we have dosed over 80 late ambulatory and non-ambulatory patients within our clinical program and continue to see a consistent safety profile.***

80.    In response to a question from a Jeffries analyst regarding how Roche, the Company's partner with the ELEVIDYS launch, was reporting a different number of patients treated than what Sarepta was reporting, Ingram stated:

I'm not going to comment or confirm that we haven't provided those numbers like that. We're going to use revenue as our metric, and we're -- as it stands today, standing on the guidance that we provided previously. I mean it certainly is the case qualitatively that we have dosed an enormous number of patients.

***We have an extraordinary amount of experience with ELEVIDYS***. Louise will have mentioned to you that we have already dosed between clinicals and some commercial 80 or so, probably more than that by now. About 80 patients that are either late ambulatory or non-ambulatory, in addition to all of the other patients we dose. ***And as you know, we've not seen a difference in any safety metrics. So things that look great***. The profile of the therapy looks great and the launch is going great. So that's where we are right now with it. And we're excited to give you an update after Q4.

81.    On January 27, 2025, the Company issued a press release with respect to test results for part two of the EMBARK study. Sarepta announced the demonstration of sustained benefits and disease stabilization following treatment with ELEVIDYS. Rodino-Klapac commented:

We're very encouraged to see the results from Part 2 of EMBARK as they further elucidate the impact ELEVIDYS has on disease progression in a blinded, controlled study. Skeletal muscle MRI demonstrates the importance of preserving muscle, and ***the functional outcome results show disease stabilization sustained through two years after treatment***.

Over time, we continue to observe a statistically significant difference favoring ELEVIDYS compared to a well-matched external control on NSAA and timed

tests. ***The consistency and totality of evidence supporting a long-term and clinically meaningful treatment benefit with ELEVIDYS continues to grow***. We look forward to sharing more details with the clinical community in upcoming scientific forums.

82.     On February 26, 2025, the Company issued a press release reporting Sarepta's 2024 fourth quarter and full year financial results. Ingram stated: "In 2025, we intend to capitalize on our 2024 achievements, in addition to 2025 net product revenue guidance of $2.9 billion to $3.1 billion, representing 70% year-over-year growth and 162% yearly growth for ELEVIDYS."

83.     Also on February 26, 2025, Defendants hosted a conference call to discuss the Company's financial results, during which Ingram stated:

Turning to ELEVIDYS, in 2024, we had by a wide margin the most successful launch of a gene therapy yet in history. For the fourth quarter, ELEVIDYS sales stood at $385 million -- $384 million, representing 112% increase over the prior sequential quarter. And while we have already achieved over $1 billion in sales since our initial approval in 2023, this represents less than 5% of the on-label addressable opportunity, so clearly this is just the beginning.

As you know, we already met our important ELEVIDYS milestone in late January. We reported the two-year and one-year crossover results for ELEVIDYS. ***From our pivotal trial EMBARK and in all pre-specified measures, that includes all functional measures, muscle health, biomarkers, those on ELEVIDYS did strongly, statistically, significantly better than untreated natural history would have predicted.*** We have passed 600 patients now on therapy across a broad range of ages and weights. These data are further proof of the transformative potential of ELEVIDYS to change the future course of this disease for patients.

84.     Moreover, Rodino-Klapac stated:

Given what we know about ELEVIDYS, what the science and data have shown us, and what we have observed in the large population of patients that have been treated with ELEVIDYS, ***we were not surprised by such overwhelmingly positive data from the study, which demonstrated that ELEVIDYS impact the trajectory of Duchenne and offers an early treatment option intended to avoid unnecessary and unavoidable muscle damage***.

In summary and evidenced by the data, ELEVIDYS demonstrated a clinically meaningful response across all of Sarepta studies with increasing divergence from natural history over time that supports the durability of the therapy.

85.     In response to a question from an RBC Capital Markets analyst regarding the data results expectations for expanded application of therapies, Ingram stated:

> We have a lot of conviction around this, as you can well imagine, first because we've already actually dosed patients with SRP-9003, but also because SRP-9003 stands on the shoulders of all of the work that we've done with 9001 now ELEVIDYS. ***We have dosed hundreds and hundreds and hundreds of patients with ELEVIDYS. We understand the law, the safety profile and we understand the power of our constructs and our promoter to get really good expression and get it safely. So that's sort of the bar and we're very confident about where we're going to go with that***.

86.     The above-referenced statements were materially false and misleading and failed to disclose material information, including that: (i) ELEVIDYS posed substantial safety risks to patients; (ii) ELEVIDYS trials and protocols failed to detect severe side effects; and (iii) the extent of the adverse events from ELEVIDYS treatment would cause Sarepta to pause recruitment and dosing in ELEVIDYS trials, attract scrutiny from regulators, and result in larger risk surrounding the therapy's present and expanded approvals.

**Proxy Statements**

87.     On April 24, 2024, the Individual Defendants caused the Company to file an annual proxy statement with the SEC (the "2024 Proxy Statement"). The 2024 Proxy Statement solicited the Company's stockholders:

> 1. to elect, as Class I directors to hold office until the 2026 annual meeting of stockholders, or until their successors are earlier elected, the following director nominees: Douglas S. Ingram, Hans Wigzell, M.D., Ph.D., Kathryn J. Boor, Ph.D., and Michael Chambers;
>
> 2. to hold an advisory vote to approve, on a non-binding basis, named executive officer compensation;
>
> 3. to ratify the selection of KPMG LLP as the Company's independent registered public accounting firm for the current year ending December 31, 2024; and
>
> 4. to transact such other business as may properly come before the Annual Meeting, or any continuation, postponement or adjournment thereof.

88.     With respect to Item 1 above, the 2024 Proxy Statement provided:

There are four nominees standing for election as Class I directors at the Annual Meeting. Based on the recommendation of the nominating and corporate governance committee, our Board has approved the nomination of the following nominees for election as Class I Directors: Douglas S. Ingram, Hans Wigzell, M.D., Ph.D., Kathryn J. Boor, Ph.D., and Michael Chambers for re-election as continuing directors. Each of the Class I director nominees has indicated that he or she will be able to serve if elected and has agreed to do so. . . .

The Board recommends that stockholders vote "FOR" the election of each of Douglas S. Ingram, Hans Wigzell, M.D., Ph.D., Kathryn J. Boor, Ph.D. and Michael Chambers as Class I Directors to the Board.

89.     With respect to Item 2 above, the 2024 Proxy Statement provided:

In accordance with Section 14A of the Exchange Act, we are asking our stockholders to approve, on a non-binding, advisory basis, the 2023 compensation paid to our named executive officers as disclosed in this proxy statement. . . .

We request stockholder approval, on an advisory basis, of the 2023 compensation of our named executive officers as disclosed in this proxy statement pursuant to the SEC's compensation disclosure rules (which disclosure includes the "Compensation Discussion and Analysis," the compensation tables and the narrative disclosures that accompany the compensation tables within this proxy statement). This vote is not intended to address any specific element of compensation, but rather the overall compensation of our named executive officers and the compensation philosophy, policies and practices described in this proxy statement.

Accordingly, we ask that you vote "FOR" the following resolution at this meeting:

"RESOLVED, that the stockholders of Sarepta Therapeutics, Inc. approve, on an advisory basis, the compensation of the named executive officers for 2023, as disclosed in Sarepta Therapeutics, Inc.'s proxy statement for the Annual Meeting of Stockholders held in 2024 pursuant to the compensation disclosure rules of the Securities and Exchange Commission, including the Compensation Discussion and Analysis, the 2023 Summary Compensation Table and the other related tables and disclosures within the proxy statement." . . .

The Board recommends that stockholders vote "FOR" the compensation of our named executive officers for 2023.

90.     The 2024 Proxy Statement further stated:

The Board and its standing committees (audit, compensation, nominating and corporate governance and research and development) oversee the management of risks inherent in the operation of our business and activities related to mitigation of such risks. The Board has delegated certain risk management responsibilities to its committees:

• The Board and the audit committee evaluate our policies with respect to risk assessment and risk management, and monitor our liquidity risk, regulatory risk, operational risk, climate risk and enterprise risk by regular reviews with management and external auditors and other advisors. In its periodic meetings with the independent accountants, the audit committee discusses the scope and plan for the audit and includes management in its review of accounting and financial controls, assessment of business risks and legal and ethical compliance programs.

• In addition, the audit committee also oversees and reviews with management the Company's information technology systems, cybersecurity policies, procedures and programs, including hardware and software improvements, to mitigate the risk of cyber-related threats and reports the findings of such review to the Board on an annual basis.

• As part of its responsibilities, the compensation committee reviews the impact of our executive compensation program and the associated incentives to determine whether they present a significant risk to us, as well as risks related to human capital.

• The Board and the nominating and corporate governance committee monitor our succession and governance risk by regular review with management and outside advisors.

• The Board and the research and development committee evaluate progress on research and development activities intended to identify, screen or advance drug candidates either for the Company's proprietary benefit or as part of an external collaboration.

91.    The 2024 Proxy Statement was materially false and misleading because it omitted, among other things, that: (i) ELEVIDYS posed substantial safety risks to patients; (ii) ELEVIDYS trials and protocols failed to detect severe side effects; (iii) the extent of the adverse events from ELEVIDYS treatment would cause Sarepta to pause recruitment and dosing in ELEVIDYS trials, attract scrutiny from regulators, and result in larger risk surrounding the therapy's present and expanded approvals; (iv) by recommending that the Company's stockholders approve the named

executive officer compensation, the Individual Defendants were wrongfully interested in increasing their compensation; (v) the Individual Defendants violated the Company's Code of Conduct; and (vi) the Individual Defendants failed to fulfill their risk oversight responsibilities.

92.    Due to the Individual Defendants' materially false and misleading statements, the Company's stockholders voted to approve the Items referenced above.

93.    On April 24, 2025, the Individual Defendants caused the Company to file an annual proxy statement with the SEC (the "2025 Proxy Statement"). The 2025 Proxy Statement solicited the Company's stockholders:

> 1. to elect, as Class II directors to hold office until the 2027 annual meeting of stockholders, or until their successors are earlier elected, the following director nominees: Richard J. Barry, M. Kathleen Behrens, Ph.D., Stephen L. Mayo, Ph.D., and Claude Nicaise, M.D.;

> 2. to hold an advisory vote to approve, on a non-binding basis, named executive officer compensation;

> 3. to approve an amendment to the Company's 2018 Equity Incentive Plan (as amended on April 3, 2020, April 5, 2022 and April 6, 2023) (the "2018 Plan") to increase the maximum aggregate number of shares of the Company's common stock that may be issued pursuant to awards granted under the 2018 Plan by 4,300,000 shares to 17,487,596 shares;

> 4. to approve an amendment to the Amended and Restated 2013 Employee Stock Purchase Plan (as amended and restated on June 27, 2016, and amended on June 6, 2019 and on June 8, 2023) (the "2016 ESPP") to increase the number of shares of the Company's common stock authorized for issuance under the 2016 ESPP by 300,000 shares to 1,700,000 shares;

> 5. to ratify the selection of KPMG LLP as the Company's independent registered public accounting firm for the current year ending December 31, 2025; and

> 6. to transact such other business as may properly come before the Annual Meeting, or any continuation, postponement or adjournment thereof.

94.    With respect to Item 1 above, the 2025 Proxy Statement provided:

There are four nominees standing for election as Class II directors at the Annual Meeting. Based on the recommendation of the nominating and corporate

governance committee, the Board has approved the nomination of the following nominees for election as Class II Directors: Richard J. Barry, M. Kathleen Behrens, Ph.D., Stephen L. Mayo, Ph.D., and Claude Nicaise, M.D. for re-election as continuing directors. Each of the Class II director nominees has indicated that he or she will be able to serve if elected and has agreed to do so.

The Board recommends that stockholders vote "FOR" the election of each of Richard J. Barry, M. Kathleen Behrens, Ph.D., Stephen L. Mayo, Ph.D., and Claude Nicaise, M.D. as Class II Directors to the Board.

95.    With respect to Item 2 above, the 2025 Proxy Statement provided:

In accordance with Section 14A of the Exchange Act, we are asking our stockholders to approve, on a non-binding, advisory basis, the 2024 compensation paid to our named executive officers as disclosed in this proxy statement. . . .

We request stockholder approval, on an advisory basis, of the 2024 compensation of our named executive officers as disclosed in this proxy statement pursuant to the SEC's compensation disclosure rules (which disclosure includes the "Compensation Discussion and Analysis," the compensation tables and the narrative disclosures that accompany the compensation tables within this proxy statement). This vote is not intended to address any specific element of compensation, but rather the overall compensation of our named executive officers and the compensation philosophy, policies and practices described in this proxy statement.

Accordingly, we ask that you vote "FOR" the following resolution at this meeting:

"RESOLVED, that the stockholders of Sarepta Therapeutics, Inc. approve, on an advisory basis, the compensation of the named executive officers for 2024, as disclosed in Sarepta Therapeutics, Inc.'s proxy statement for the Annual Meeting of Stockholders held in 2025 pursuant to the compensation disclosure rules of the Securities and Exchange Commission, including the Compensation Discussion and Analysis, the 2024 Summary Compensation Table and the other related tables and disclosures within the proxy statement." . . .

The Board recommends that stockholders vote "FOR" the compensation of our named executive officers for 2024.

96.    With respect to Item 3 above, the 2025 Proxy Statement stated:

The Company and the Board have proposed to amend the Company's 2018 Equity Incentive Plan (as amended on April 3, 2020, April 5, 2022 and April 6, 2023) (the "2018 Plan") to increase the maximum aggregate number of shares of common stock that may be issued pursuant to awards granted under the 2018 Plan by 4,300,000 shares to 17,487,596 shares (plus the number of shares subject to

outstanding awards under the Amended and Restated 2011 Equity Incentive Plan (the "2011 Plan") that expire or otherwise terminate without having been exercised in full, or are forfeited to or repurchased by us up to a maximum as described below). . . .

The Board recommends that stockholders vote "FOR" approval of the amendment to the 2018 Plan.

97.    With respect to Item 4 above, the 2025 Proxy Statement provided:

Stockholders are being asked to approve an amendment ("Amendment No. 3") to the Company's Amended and Restated 2013 Employee Stock Purchase Plan (as Amended and Restated as of June 27, 2016) (the "2016 ESPP"). Amendment No. 3 was adopted by the Board on April 11, 2025 and will become effective upon receiving stockholder approval at our Annual Meeting. The 2016 ESPP was originally adopted by the Board on April 16, 2013, approved by our stockholders on June 4, 2013, amended and restated by the Board on May 6, 2016, and approved by our stockholders on June 27, 2016, and then further amended by the Board effective April 22, 2019 and approved by our stockholders on June 6, 2019, and again amended by the Board on April 6, 2023 and approved by our stockholders on June 8, 2023.

The purpose of Amendment No. 3 is to increase the number of shares of our common stock authorized for issuance under the 2016 Plan by 300,000 shares so that eligible employees of the Company and certain of its subsidiaries can continue to acquire a stock ownership interest in the Company pursuant to a plan that is intended to qualify as an "employee stock purchase plan" within the meaning of Section 423(b) of the Internal Revenue Code of 1986, as amended (the "Code"). We believe that offering an employee stock purchase plan helps eligible employees provide for their future financial security, encourages such employees to remain in the employment of the Company and its subsidiaries, and further aligns their interests with those of our stockholders by increasing such employees' ownership in the Company. The 2016 Plan, as subsequently amended, is intended to qualify as an "employee stock purchase plan" meeting the requirements of Section 423 of the Code. . . .

The board of directors recommends that stockholders vote "FOR" approval of Amendment No. 3.

98.    The 2025 Proxy Statement further stated:

The Board and its standing committees (audit, compensation, nominating and corporate governance and research and development) oversee the management of risks inherent in the operation of our business and activities related to mitigation of such risks. The Board has delegated certain risk management responsibilities to its committees:

• The Board and the audit committee evaluate our policies with respect to risk assessment and risk management, and monitor our liquidity risk, regulatory risk, operational risk, climate risk and enterprise risk by regular reviews with management and external auditors and other advisors. In its periodic meetings with the independent accountants, the audit committee discusses the scope and plan for the audit and includes management in its review of accounting and financial controls, assessment of business risks and legal and ethical compliance programs.

• In addition, the audit committee also oversees and reviews with management the Company's information technology systems, cybersecurity policies, procedures and programs, including hardware and software improvements (such as potential artificial intelligence tools), to mitigate the risk of cyber-related threats and reports the findings of such review to the Board on an annual basis.

• As part of its responsibilities, the compensation committee reviews the impact of our executive compensation program and the associated incentives to determine whether they present a significant risk to us, as well as risks related to human capital.

• The Board and the nominating and corporate governance committee monitor our succession and governance risk by regular review with management and outside advisors.

• The Board and the research and development committee evaluate progress on research and development activities intended to identify, screen or advance drug candidates either for the Company's proprietary benefit or as part of an external collaboration.

99.     The 2025 Proxy Statement was materially false and misleading because it omitted, among other things, that: (i) ELEVIDYS posed substantial safety risks to patients; (ii) ELEVIDYS trials and protocols failed to detect severe side effects; (iii) the extent of the adverse events from ELEVIDYS treatment would cause Sarepta to pause recruitment and dosing in ELEVIDYS trials, attract scrutiny from regulators, and result in larger risk surrounding the therapy's present and expanded approvals; (iv) by recommending that the Company's stockholders approve the named executive officer compensation, the amendment to the 2018 Plan, and Amendment No. 3 to the 2016 ESPP, the Individual Defendants were wrongfully interested in increasing their compensation; (v) the Individual Defendants violated the Company's Code of Conduct; and (vi)

the Individual Defendants failed to fulfill their risk oversight responsibilities.

100.    Due to the Individual Defendants' materially false and misleading statements, the Company's stockholders voted to approve the Items referenced above.

**The Truth is Revealed**

101.    On March 18, 2025, the Company reported that a patient died after ELEVIDYS treatment. Specifically, the patient suffered acute liver failure that resulted in death, which represented "a severity of acute liver injury not previously reported for ELEVIDYS." However, Sarepta assured investors that "benefit-risk of ELEVIDYS remains positive."

102.    Following this news, the Company's stock price fell 27.44 percent, or $27.81 per share, to close at $73.54 per share on March 18, 2025.

103.    On April 4, 2025, the Company issued a press release reporting that European Union authorities requested that an independent data monitoring committee meet to review the patient death announced by the Company on March 18, 2025. The Company then halted recruitment and dosing in several of the ELEVIDYS clinical studies, SRP-9001-302 (ENVOL), Study SRP-9001-303 (ENVISION), and Study SRP- 9001-104. However, the Company asserted that the "temporary" pause should not have a material impact on the affected studies.

104.    Following this news, the Company's stock price fell 7.13 percent, or $4.18 per share, to close at $54.43 per share on April 4, 2025.

105.    On June 15, 2025, the Company reported that a second patient died of acute liver failure after ELEVIDYS treatment. Sarepta stated that it was suspending shipments of ELEVIDYS for non-ambulatory patients while it evaluated trial regimens and discussed findings with regulatory authorities. Sarepta also disclosed that it was halting dosing of ELEVIDYS in the ENVISION clinical study, Study SRP-9001-303, to consider the protocol in accordance with the

FDA.

106.    Following this news, the Company's stock price fell 42.12 percent, or $15.24 per share, to close at $20.91 per share on June 15, 2025.

107.    Then on June 24, 2025, the FDA issued a safety communication announcing that it received reports of two deaths and that it was investigating the risk of acute liver failure with serious outcomes following ELEVIDYS treatment. The FDA stated that it was evaluating the need for further regulatory action.

108.    Following this news, the Company's stock price fell 8.01 percent, or $1.52 per share, to close at $17.46 per share on June 25, 2025.

**Insider Sales**

109.    During the Relevant Period, while the Company's stock price was artificially inflated, Individual Defendants Wigzell, Mayo, Boor, Murray, and Nicaise engaged in improper insider sales, netting total proceeds of over $6.2 million.

110.    Individual Defendant Wigzell's insider sales are set forth below:

| DATE | SHARES SOLD | AVERAGE SHARE PRICE | TOTAL SALE PROCEEDS |
|---|---|---|---|
| August 4, 2023 | 15,000 | $106.72 | $1,600,800 |
| March 8, 2024 | 15,000 | $123.25 | $1,848,750 |
| December 12, 2024 | 10,500 | $124.84 | $1,310,820 |
| TOTAL | 40,500 | | $4,760,370 |

111.    Individual Defendant Mayo's insider sales are set forth below:

| DATE | SHARES SOLD | AVERAGE SHARE PRICE | TOTAL SALE PROCEEDS |
|---|---|---|---|
| March 5, 2024 | 3,135 | $122.96 | $385,478.60 |

112.    Individual Defendant Boor's insider sales are set forth below:

| DATE | SHARES SOLD | AVERAGE SHARE PRICE | TOTAL SALE PROCEEDS |
|---|---|---|---|
| March 11, 2024 | 761 | $122.93 | $93,549.73 |
| December 5, 2024 | 1,636 | $125.55 | $205,399.80 |
| TOTAL | 2,397 | | $298,949.53 |

113.    Individual Defendant Murray's insider sales are set forth below:

| DATE | SHARES SOLD | AVERAGE SHARE PRICE | TOTAL SALE PROCEEDS |
|---|---|---|---|
| May 2, 2024 | 3,635 | $140.00 | $508,900 |

114.    Individual Defendant Nicaise's insider sales are set forth below:

| DATE | SHARES SOLD | AVERAGE SHARE PRICE | TOTAL SALE PROCEEDS |
|---|---|---|---|
| March 12, 2025 | 2,491 | $99.64 | $248,203.24 |

**The Securities Class Action**

115.    As a result of the foregoing, the Securities Class Action was filed against the Company, Ingram, Murray, and Rodino-Klapac, captioned *Dolgicer v. Sarepta Therapeutics, Inc.*, Case No. 1:25-cv-05317 (S.D.N.Y.).

116.    As a result, Sarepta has incurred, and will continue to incur, substantial costs to defend itself in the Securities Class Action, and is exposed to massive potential class-wide liability.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

117.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

118.    Sarepta is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

119.    Plaintiff is a current shareholder of Sarepta and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

120.    A pre-suit demand on the Board of Sarepta is futile and, therefore, excused.  The Board consists of Individual Defendants Behrens, Barry, Boor, Chambers, Connelly, Ingram, Mayo, Nicaise, and Wigzell.

121.    Given the factual allegations set forth herein, Plaintiff has not made a demand on the Board to bring this action against the Individual Defendants.  A pre-suit demand on the Board would be futile as there is reason to doubt that a majority of the members of the Board is capable of making an independent and/or disinterested decision to initiate and vigorously pursue this action.

122.    The Individual Defendants either knew, or should have known, that the statements they issued, or caused to be issued on the Company's behalf, were materially false and misleading, but they took no steps in a good faith effort to prevent or remedy that situation.

123.    Each of the Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

124.    Each of the Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders,

authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

125.    Additionally, each of the Individual Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

126.    Individual Defendants Behrens, Barry, and Mayo are not disinterested or independent.  Behrens, Barry, and Mayo are members of the Audit Committee, the purpose of which is to assist the Company's directors with fulfilling their oversight responsibilities regarding, among other things, accounting, legal, regulatory, and public disclosure requirements. Therefore, Behrens, Barry, and Mayo knowingly or recklessly allowed the issuance of the aforementioned improper statements.

127.    Defendants Barry, Boor, Connelly, and Wigzell are not disinterested or independent.  Barry, Boor, Connelly, and Wigzell are members of the Nominating and Governance Committee, the purpose of which includes overseeing the corporate governance policies and procedures of the Company.  Barry, Boor, Connelly, and Wigzell failed to review regulatory developments and governance best practices for the Company and allowed the Individual Defendants to disseminate material misinformation as set forth above.

128.    Individual Defendants Ingram, Barry, Behrens, Boor, Chambers, Mayo, Nicaise, and Wigzell are not disinterested or independent. Ingram, Barry, Behrens, Boor, Chambers, Mayo, Nicaise, and Wigzell caused the issuance of the 2024 Proxy Statement. As alleged above, due to the Individual Defendants' materially false and misleading statements in the 2024 Proxy Statement, the Company's stockholders voted to approve Items 1-4 in the 2024 Proxy Statement,

including the election of the Individual Defendants to the Board and the approval of the named executive officer compensation. Thus, Ingram, Barry, Behrens, Boor, Chambers, Mayo, Nicaise, and Wigzell are not disinterested or independent, and demand upon them would be futile.

129.    Individual Defendants Ingram, Barry, Behrens, Boor, Chambers, Connelly, Mayo, Nicaise, and Wigzell are not disinterested or independent. Ingram, Barry, Behrens, Boor, Chambers, Connelly, Mayo, Nicaise, and Wigzell caused the issuance of the 2025 Proxy Statement. As alleged above, due to the Individual Defendants' materially false and misleading statements in the 2025 Proxy Statement, the Company's stockholders voted to approve Items 1-6 in the 2025 Proxy Statement, including the election of the Individual Defendants to the Board and the approval of the named executive officer compensation, the amendment to the 2018 Plan, and Amendment No. 3 to the 2016 ESPP. Thus, Ingram, Barry, Behrens, Boor, Chambers, Connelly, Mayo, Nicaise, and Wigzell are not disinterested or independent, and demand upon them would be futile.

130.    Individual Defendants Wigzell, Mayo, Boor, and Nicaise are not disinterested or independent. Wigzell, Mayo, Boor, and Nicaise engaged in improper insider sales while in possession of material non-public information about the Company.

131.    The Individual Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Individual Defendants to also adhere to the Company's standards of business conduct. The Individual Defendants violated the Code of Conduct because they knowingly or recklessly engaged in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Individual Defendants violated the Code of Conduct, they face a substantial likelihood

of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

132.    Individual Defendant Ingram is not disinterested or independent. Ingram is CEO and President of the Company, and he derives substantial compensation from his relationship with the Company. As alleged above, Ingram was directly involved in and perpetrated the scheme alleged herein. Moreover, Ingram was named as a defendant and, therefore, faces a substantial likelihood of liability, in the Securities Class Action based on substantially the same wrongdoing alleged herein. Thus, Ingram is not disinterested or independent.

133.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

134.    The acts complained of herein constitute violations of fiduciary duties owed by the Company's officers and directors, and these acts are incapable of ratification.

135.    Accordingly, for all of the reasons set forth above, at least a majority of the Company's current directors cannot consider a demand with disinterestedness and independence. Consequently, a pre-suit demand on the Board is futile and excused.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

136.    Plaintiff incorporates by reference and realleges each and every allegation

contained above, as though fully set forth herein.

137.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

138.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

139.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

140.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

141.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock,

resulting in an increased cost of capital, and reputational harm.

## COUNT II

### Against the Individual Defendants for Aiding and
### Abetting Breach of Fiduciary Duty

142.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

143.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

144.    Plaintiff, on behalf of Sarepta, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

145.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

146.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Sarepta.

147.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Sarepta that was tied to the performance or artificially inflated valuation of Sarepta, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

148.    Moreover, as alleged herein, Individual Defendants Wigzell, Mayo, Boor, Murray, and Nicaise engaged in improper insider sales while in possession of material non-public information about the Company, netting total proceeds of approximately $6.2 million.

149.    Plaintiff, as a shareholder and a representative of Sarepta, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

150.    Plaintiff on behalf of Sarepta has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Waste of Corporate Assets

151.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

152.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.   It resulted in continuous, connected, and ongoing harm to the Company.

153.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Action.

154.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

155.    Plaintiff, on behalf Sarepta, has no adequate remedy at law.

43

## COUNT V

### Against Individual Defendants Ingram, Murray, and Rodino-Klapac for Contribution Under Sections 10(b) and 21D of the Exchange Act

156.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

157.    Sarepta and Individual Defendants Ingram, Murray, and Rodino-Klapac are named as defendants in the Securities Class Action, which asserts claims under federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder by the SEC. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole, or in part, due to Ingram's, Murray's, and Rodino-Klapac's willful and/or reckless violations of their obligations as officers and/or directors of Sarepta.

158.    Defendants Ingram, Murray, and Rodino-Klapac, because of their positions of control and authority as officers and/or directors of Sarepta, were able to, and did, directly and/or indirectly, exercise control over the business and corporate affairs of Sarepta, including the wrongful acts complained of herein and in the Securities Class Action.

159.    Accordingly, Ingram, Murray, and Rodino-Klapac are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

160.    As such, Sarepta is entitled to receive all appropriate contribution or indemnification from Ingram, Murray, and Rodino-Klapac.

161.    Plaintiff, on behalf Sarepta, has no adequate remedy at law.

## COUNT VI

**Against the Individual Defendants for Violations of Section 14(a)
of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9)**

162.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

163.    The Individual Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

164.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that "[i]t shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

165.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9

166.    The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2024 Proxy Statement and the 2025 Proxy Statement, which were filed with the SEC.

167.    As alleged above, the 2024 Proxy Statement was materially false and misleading because it omitted, among other things, that: (i) ELEVIDYS posed substantial safety risks to

patients; (ii) ELEVIDYS trials and protocols failed to detect severe side effects; (iii) the extent of the adverse events from ELEVIDYS treatment would cause Sarepta to pause recruitment and dosing in ELEVIDYS trials, attract scrutiny from regulators, and result in larger risk surrounding the therapy's present and expanded approvals; (iv) by recommending that the Company's stockholders approve the named executive officer compensation, the Individual Defendants were wrongfully interested in increasing their compensation; (v) the Individual Defendants violated the Company's Code of Conduct; and (vi) the Individual Defendants failed to fulfill their risk oversight responsibilities.

168.    Moreover, the 2025 Proxy Statement was materially false and misleading because it omitted, among other things, that: (i) ELEVIDYS posed substantial safety risks to patients; (ii) ELEVIDYS trials and protocols failed to detect severe side effects; (iii) the extent of the adverse events from ELEVIDYS treatment would cause Sarepta to pause recruitment and dosing in ELEVIDYS trials, attract scrutiny from regulators, and result in larger risk surrounding the therapy's present and expanded approvals; (iv) by recommending that the Company's stockholders approve the named executive officer compensation, the amendment to the 2018 Plan, and Amendment No. 3 to the 2016 ESPP, the Individual Defendants were wrongfully interested in increasing their compensation; (v) the Individual Defendants violated the Company's Code of Conduct; and (vi) the Individual Defendants failed to fulfill their risk oversight responsibilities.

169.    The misrepresentations and omissions in the 2024 Proxy Statement and the 2025 Proxy Statement were material to Company stockholders. Specifically, the misrepresentations and omissions were material to Company stockholders in voting on matters set forth for shareholder determination in the 2024 Proxy Statement and 2025 Proxy Statement, including, but not limited to, the reelection of certain Individual Defendants and the approval of the named executive officer

compensation, the amendment to the 2018 Plan, and Amendment No. 3 to the 2016 ESPP.

170.    The Company was damaged as a result of Defendants' material misrepresentations and omissions in the 2024 Proxy Statement and the 2025 Proxy Statement.

171.    As a result of the Individual Defendants' material misrepresentations and omissions, the Company has sustained significant damages.

172.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

### COUNT VII

**Against the Individual Defendants
For Violations of Section 20(a) of the Exchange Act**

173.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

174.    The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions of control within the Company, the Individual Defendants had the authority to cause the Company to issue the materially false and misleading statements alleged herein.

175.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their

unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.      Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to:

•       strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

•       strengthening the Company's internal reporting and financial disclosure controls;

•       developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and

•       strengthening the Board's internal operational control functions;

D.      Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: July 15, 2025

OF COUNSEL:

**GRABAR LAW OFFICE**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
jgrabar@grabarlaw.com

**RIGRODSKY LAW, P.A.**

By:  */s/ Gina M. Serra*
Seth D. Rigrodsky
Gina M. Serra
825 East Gate Blvd., Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Facsimile: (302) 654-7530
sdr@rl-legal.com
gms@rl-legal.com

*Attorneys for Plaintiff*